# EXHIBIT A

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

APR 30 2013

OFFICE OF
THE ADMINISTRATOR

Mr. Edward B. Zukoski
Staff Attorney
Earthjustice
1400 Glenarm Place, Suite 300
Denver, Colorado 80202-5050

Dear Mr. Zukoski:

On June 16, 2010, Earthjustice, acting on behalf of WildEarth Guardians, Center for Biological Diversity, the Environmental Integrity Project and the Sierra Club, who collectively are the petitioners, sent a letter to the U.S. Environmental Protection Agency petitioning the agency to make a finding that air emissions from coal mines may reasonably be anticipated to endanger public health and welfare, thus warranting listing coal mines as a new stationary-source category pursuant to Clean Air Act section 111(b)(1)(A), and to conduct any required associated rulemakings.

I am informing you that the EPA is denying this petition to add coal mines to the Clean Air Act section 111 list of categories and declining to initiate the requested rulemakings at this time. This denial fully and finally responds to your petition and is the EPA's final agency action on your petition. As discussed below, the agency must prioritize its regulatory actions. This is especially the case in light of limited resources and ongoing budget uncertainties. For these reasons, the EPA at this time cannot commit to conducting the process to determine whether coal mines should be added to the list of categories under Clean Air Act 111(b)(1)(A) and thus is denying your petition. This denial is not based on a determination as to whether the emissions from coal mines cause or significantly contribute to air pollution that may reasonably be anticipated to endanger public health and welfare. In the future, the EPA may initiate the process for such a determination, but the agency has decided that it will not do so now.[1]

## I. Introduction

### A. Statutory Provisions

Clean Air Act section 111(b)(1)(A) provides that the EPA "shall publish (and from time to time thereafter shall revise) a list of categories of stationary sources [and shall include a category on the list]

---

[1] The June 2010 petition also asked the EPA, after listing coal mines under Clean Air Act section 111, to establish federal standards of performance for new and modified sources in the coal-mines category and establish federal standards of performance to address methane emissions from existing sources within the coal-mines category. Because the EPA is denying the request to list coal mines at this time and because the duty to set standards under Clean Air Act section 111 for a given category is based on the listing of that category under section 111(b)(1)(A), the request that the EPA set standards for new, modified and existing sources within the coal-mines category is moot.

if in [the Administrator's] judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." For categories that the EPA lists under section 111(b)(1)(A), section 111(b)(1)(B) provides that the EPA must propose federal standards of performance for new sources within the newly established category within one year of listing and then, after an opportunity for public comment, finalize the standards within one year of publishing the proposed standards.

## B. Procedural History

On June 16, 2010, the petitioners sent a letter to the EPA petitioning the agency to:

> (1) make a finding that air emissions from coal mines may reasonably be anticipated to endanger public health and welfare, thus warranting listing coal mines as a new stationary-source category pursuant to Clean Air Act section 111(b)(1)(A);
> (2) establish federal standards of performance for air emissions from new and modified coal mines pursuant to Clean Air Act section 111(b)(1)(B);
> (3) issue federal standards of performance for methane emissions from existing coal mines pursuant to Clean Air Act section 111(d)(1).

*Petition, at 2-3.*

On April 8, 2011, the petitioners notified the EPA of their intent to file suit against the EPA for failure to respond to the June 2010 petition, as required by Clean Air Act section 304(a). On November 17, 2011, the petitioners filed a complaint with the United States District Court for the District of Columbia, alleging that the EPA had unreasonably delayed taking final action on the petition for rulemaking and requesting that the court compel action under the Clean Air Act and the Administrative Procedure Act. The EPA and the petitioners subsequently agreed to stay the litigation to allow the EPA time to determine whether it could commit to act on the petition within a specific time frame, in light of the agency's limited resources, ongoing budget uncertainties and existing obligations to meet statutory and consent decree deadlines.

## II. Summary of Petition

In their petition, the petitioners cite the definition of "air pollutants" in Clean Air Act section 302(g), assert that air emissions from coal mines – including surface, underground and abandoned mines – are such pollutants and hence request that the EPA regulate air emissions from coal mines under section 111 of the Clean Air Act. The petitioners' primary stated goal is the reduction of methane, but they also want reductions of emissions of particulate matter, nitrogen oxides and volatile organic compounds. The petitioners assert that pursuant to Clean Air Act section 111(b)(1)(A), the EPA is required to list coal mines as a new category of stationary sources that emit air pollution when such emissions may reasonably be anticipated to endanger public health or welfare. Additionally, the petitioners assert that the EPA must establish federal standards of performance for new and modified sources within the newly listed stationary-source category for coal mines and establish federal standards of performance to address methane emissions from existing sources within the newly listed stationary-source category for coal mines.

The petitioners argue that pursuant to the requirements of Clean Air Act section 111, air emissions from coal mines must be regulated because they cause or significantly contribute to the endangerment of the

public health and welfare. The petitioners cite examples and references regarding the effects of greenhouse gases on climate change and the consequences on public health and welfare. The petitioners state that methane is the second-most emitted greenhouse gas and that its heat trapping capability is more than 20 times more potent than carbon dioxide. They further state that because methane has a significantly shorter atmospheric lifespan compared to the lifespan of carbon dioxide, reducing methane emissions may mitigate climate change to a greater degree in the short term. Additionally, the petitioners state that methane is a safety hazard and known public-health risk that can create an explosive hazard to coal miners and contributes to the formation of ground-level ozone pollution.

The petitioners identify several technological emission-control measures that they claim could reduce methane emissions from coal mines. They state that they also seek "to spur the development of cost-effective controls to reduce harmful air emissions from coal mining … to both spur economic development and confront the effects of global warming."

## III. Response to Requests

The petitioners request that the EPA make a finding that air emissions from coal mines cause or significantly contribute to air pollution that may reasonably be anticipated to endanger public health or welfare and list coal mines as a stationary-source category under Clean Air Act section 111. While the EPA has sought to be responsive and to consider the petitioners' request, resource limitations and the necessity of completing court-ordered rulemaking actions have continued to hinder that effort. Between fiscal years 2006 and 2013, the budget for the EPA's Office of Air Quality Planning and Standards –the office that would conduct a Clean Air Act 111(b)(1)(A) review for coal mines – was reduced by 12 percent in real dollars and staff levels have also slightly decreased. Moreover, the portion of the budget available to provide additional technical support through contracting has been reduced by 43 percent in real dollars as a result of these budgetary reductions and increases in other costs. More recently, the reduced appropriations in the continuing resolution funding the EPA for the remainder of fiscal year 2013, in conjunction with the automatic reductions in federal agency resources known as the sequestration, have impacted the EPA's ability to respond. Specifically, the reductions mandated by the sequestration have further reduced the EPA's 2013 budget and have necessitated significant reductions in a number of regulatory efforts already under way. As part of the sequestration, the EPA is facing agencywide furloughs of almost 10 days per employee between April 21 and September 30, which further reduces available staff time.

Even under the best circumstances, the EPA cannot undertake simultaneously all actions related to clearly determined priorities as well as those requested by the public, and so the agency must afford precedence to certain actions while deferring others. The current budgetary situation serves only to increase the need for setting priorities. The EPA already is required to conduct numerous actions that have mandatory deadlines, including a number of actions resolving mandatory duty claims made by WildEarth Guardians and the other petitioners, and has little or no discretion to lower the priority of those actions. For example, the Office of Air Quality Planning and Standards faces an agenda of more than 45 nationally applicable stationary-source rules due for review or promulgation by September 2014. Of these 45 rules, more than 25 are subject to consent decrees with current deadlines that must be met between now and the end of fiscal year 2014, leaving the EPA no discretion to prioritize. In addition, more than 15 additional, recently issued rules are either being challenged in court or stakeholders have petitioned us to reconsider these rules. Both defending the litigation and evaluating petitions for reconsideration require significant commitment of the agency's staff, time and resources. Thus, the

agency is being asked to accomplish many actions with less budget and staff available. The EPA must prioritize its undertakings to efficiently use its remaining resources.

The EPA is taking a common-sense, step-by-step approach intended to obtain the most significant greenhouse-gas-emissions reductions through using the most cost-effective measures first. The sectors and source categories that the EPA is currently addressing under the Clean Air Act and through voluntary climate programs represent more than 60 percent of the total 2011 U.S. emissions of greenhouse gases.[2] The EPA believes that a step-by-step approach, starting with these largest sources and sectors, such as transportation and electricity systems, is the most appropriate course to reduce greenhouse-gas emissions, and the agency has undertaken a number of significant rulemakings intended to do so. To achieve reductions in greenhouse-gas emissions from the transportation sector, which represented 27 percent of 2011 U.S. greenhouse-gas emissions, the EPA has proposed and finalized standards for greenhouse-gas emissions both from heavy-duty trucks and twice from cars and light-duty trucks.[3,4,5,6,7,8]

As for stationary sources, approximately 45 categories of them emit greenhouse gases. The agency is currently addressing standards for greenhouse-gas emissions from new units in the electricity-generating category after having issued a proposal in April 2012.[9] Pursuant to a consent decree negotiated with your clients, the EPA also recently completed a rulemaking in which it significantly increased the regulation of emissions from the oil and natural-gas sector. While the agency did not directly regulate greenhouse gases in that rule, greenhouse-gas co-benefits from that rule are estimated at 19 million metric tons $CO_2e$.[10] As we indicated in the final oil and gas rule, we continue to evaluate whether there are additional reduction opportunities in the sector that can be achieved by regulatory or nonregulatory tools. The agency is also currently devoting resources to conducting the eight-year review of the new source performance standards applicable to municipal solid-waste landfills. We anticipate that any revision of this standard would result in significant additional greenhouse-gas benefits. In contrast to the electricity-generating sector, the coal-mines category represents about 1 percent of total 2011 U.S. greenhouse-gas emissions.[11]

A decision to list and then promulgate standards for the coal-mines category would divert resources from other higher-priority activities that the EPA is currently undertaking, which would halt or slow that work. Based on its experience, the EPA anticipates that proposing and finalizing a determination regarding emissions from coal mines would likely require significant agency time and resources. To consider making a finding under Clean Air Act 111(b)(1)(A), the EPA would need to characterize emissions from the coal-mining sector; review and evaluate climate change scientific-assessment literature issued since the 2009 endangerment finding established that six key well-mixed greenhouse gases in the atmosphere threaten the public health and welfare of current and future generations; and

---

[2] U.S. Environmental Protection Agency, *Draft Inventory of U.S. GHG Emissions and Sinks 1990-2011.* (2013).
[3] 74 Fed. Reg. 49454 (Sep. 28, 2009).
[4] 75 Fed. Reg. 74152 (Nov. 30, 2010).
[5] 75 Fed. Reg. 25324 (May 7, 2010).
[6] 76 Fed. Reg. 57106 (Sep. 15, 2011).
[7] 76 Fed. Reg. 74854 (Dec. 1, 2011).
[8] 77 Fed. Reg. 62624 (Oct. 15, 2012).
[9] Electricity-generating units represented approximately one-third of 2011 U.S. greenhouse-gas emissions and are the largest direct stationary-source emitters of greenhouse gases. *Supra* note 2.
[10] 77 Fed. Reg. 49490 (Aug. 16, 2012).
[11] *Supra* note 2.

identify, review and evaluate scientific literature pertaining specifically to climate change and the coal-mining sector as appropriate.

If, after conducting that analysis, the agency were to decide to list coal mines under Clean Air Act 111(b)(1)(A), the statute requires that the EPA propose standards within one year of listing. Proposing standards for coal mines under Clean Air Act 111(b)(1)(B) would involve a full assessment of the technical, policy and program design questions required under Clean Air Act section 111 and completion of appropriate detailed studies and assessments pertaining to standard setting. The EPA would also need to ensure full coordination with other federal agencies with jurisdiction over coal mines, such as the Mine and Safety Health Administration, regarding worker safety implications of the technologies available for reducing coal-mine emissions, and the Bureau of Land Management, regarding leasing authorities and gas rights on federal lands.

Agencies are generally given significant discretion in ordering their priorities and directing where the agency's limited resources will be devoted. At this time and in light of the constraints discussed above, we do not conclude that the EPA's proper course of action is to reallocate resources from the agency's other priorities and actions, including those related to greenhouse gases, to act on your petition. At this point, the agency believes it must address other, higher-priority actions before it can commit to consider whether to list coal mines as a stationary-source category under the Clean Air Act 111(b)(1)(A).

## IV. Conclusion

For the reasons discussed above, the EPA is denying the June 2010 petition to add coal mines to the Clean Air Act section 111 list of categories and declining to initiate the requested rulemaking at this time. This is the EPA's final agency action on this petition.

Sincerely,

Bob Perciasepe
Acting Administrator



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
SECTOR POLICIES AND PROGRAMS DIVISION
OFFICE OF AIR QUALITY PLANNING AND STANDARDS
OFFICE OF AIR AND RADIATION

**MEMORANDUM**

**SUBJECT:** OAQPS Budget and Staffing Information

**FROM:** Allison Mayer
OAQPS/SPPD/FIG (E143-03)

**TO:** Coal Mines Docket (EPA-HQ-OAR-2013-0358)

**DATE:** April 30, 2013

Below is a table showing OAQPS's budget history, extramural funds, and staffing levels from fiscal years 2006-2013.

**OAQPS Budget and Staffing Levels**

| Fiscal Year | OAQPS Budget[1] (Millions) | OAQPS Extramural Funds[1] (Millions) | FTE[3] |
|---|---|---|---|
| 2006 | $77.2 | $37.2 | 348.4 |
| 2007 | $76.7 | $35.2 | 340.4 |
| 2008 | $73.1 | $29.9 | 340.4 |
| 2009 | $73.4 | $28.1 | 340.4 |
| 2010 | $75.1 | $28.9 | 339.4 |
| 2011 | $79.9 | $25.7 | 355.9 |
| 2012 | $74.3 | $22.6 | 345.7 |
| 2013 | $68.0[2] | $21.2[2] | 345.7[4] |

**Notes:**

[1] This information was obtained from Compass financial database unless otherwise noted

[2] This estimate came from the March 7, 2013 Office of Budget Sequestration Planning Exercise

[3] This information was obtained from the internal EPA FTE allocation spreadsheet distributed to offices in EPA's Office of Air and Radiation

[4] Expected FTE, subject to change



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
SECTOR POLICIES AND PROGRAMS DIVISION
OFFICE OF AIR QUALITY PLANNING AND STANDARDS
OFFICE OF AIR AND RADIATION

**MEMORANDUM**

**SUBJECT:**   OAQPS Workload

**FROM:**   Allison Mayer
OAQPS/SPPD/FIG (E143-03)

**TO:**   Coal Mines Docket (EPA-HQ-OAR-2013-0358)

**DATE:**   April 30, 2013

    Attached is information regarding OAQPS's workload, court-ordered rules, petitions for reconsideration, and matters subject to litigation between May 2013 and September 2014.

# OAQPS Rules
# May 2013-End of FY 2014

**Court-ordered Rules**
1. Landfills NSPS
2. Kraft Pulp Mills NSPS NPRM
3. Flexible Polyurethane Foam Production RTR NPRM
4. Phosphoric Acid RTR NPRM
5. Phosphate Fertilizers Production RTR NPRM
6. Ferroalloys RTR Final
7. Acrylic and Modacrylic Fibers Production RTR NPRM
8. Polycarbonate Production RTR NPRM
9. Amino/Phenolic Resins RTR NPRM
10. Off-Site Waste and Recovery Operations RTR NPRM
11. Mineral Wool RTR Final
12. Wool Fiberglass RTR Final
13. Pesticide Active Ingredients RTR Final
14. Polyether Polyols Production RTR Final
15. Group IV Polymers and Resins RTR Final
16. Brick and Structural Clay Products NESHAP NPRM
17. Clay Ceramics NESHAP NPRM
18. Kraft Pulp Mills NSPS Final
19. Primary Aluminum Reduction Plants RTR Final
20. Secondary Aluminum Production RTR Final
21. Aerospace RTR NPRM
22. Flexible Polyurethane Foam Production RTR Final
23. Phosphoric Acid RTR Final
24. Phosphate Fertilizers Production RTR Final
25. Acrylic and Modacrylic Fibers Production RTR Final
26. Polycarbonate Production RTR Final
27. Amino/Phenolic Resins RTR Final
28. Off-Site Waste and Recovery Operations RTR Final

**Other planned Rules**
29. Grain Elevators NSPS NPRM
30. NESHAP MACT for Petroleum Refineries Heat Exchangers Final
31. Primary Lead RTR Reconsideration NPRM
32. Secondary Lead RTR Reconsideration NPRM
33. Secondary Lead RTR Direct Final/Parallel Proposal
34. Residential Wood Heater NSPS NPRM
35. Polyvinyl Chloride MACT Reconsideration NPRM
36. NSPS Electronic Reporting Rule NPRM
37. Primary Lead RTR Reconsideration Final

38. Secondary Lead RTR Reconsideration Final
39. Petroleum Refinery Flares NESHAP NPRM Amendment
40. Electric Generating Units GHG NSPS Final
41. Oil & Gas NSPS Reconsideration NPRM
42. NSPS Proposed Section 111(b)(1)(B) Determinations
43. SSM Part 63 Amendments NPRM
44. Sewage Sludge Incineration Federal Plan NPRM
45. Oil & Gas NSPS Reconsideration Final
46. Stationary Combustion Turbines NSPS Reconsideration Final
47. Grain Elevators NSPS Final
48. Large Municipal Waste Combustors NSPS NPRM
49. Small Municipal Waste Combustors NSPS NPRM
50. Oil & Gas NESHAP Reconsideration NPRM

**Petitions for Reconsideration and/or Subject to Litigation**

1. Oil & Gas NESHAP and NSPS
2. Petroleum Refineries NSPS Subpart Ja
3. Petroleum Refineries MACT 1 & 2
4. Pulp & Paper RTR
5. Primary Lead RTR
6. Secondary Lead RTR
7. Polyvinyl Chloride MACT
8. Mercury and Air Toxics Standards NSPS and NESHAP
9. Reciprocating Internal Combustion Engines NSPS and NESHAP
10. Boilers Major Sources NESHAP
11. Boilers Area Sources NESHAP
12. Commercial and Industrial Solid Waste Incinerators NSPS and Emission Guidelines
13. Portland Cement NESHAP
14. Sewage Sludge Incinerators NSPS and Emission Guidelines
15. Coal Preparation and Processing Plants NSPS
16. Steel Pickling RTR
17. Chromium Electroplating RTR
18. Nitric Acid NSPS