1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, | CASE NO. C20-1362 MJP |
| Plaintiff, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| Defendant. | |

This matter comes before the Court on the Parties' Cross-Motions for Summary

Judgment. (Dkt. Nos. 52, 54.) Having reviewed the Cross Motions, the Responses and Replies

(Dkt. Nos. 55, 56), and all supporting materials, the Court GRANTS Plaintiff's Motion in part

and DENIES Defendant's Motion.

**BACKGROUND**

In 2013, Plaintiff Northwest Environmental Advocates (NWEA) petitioned Defendant

Environmental Protection Agency (EPA) to issue new and revised water quality standards

(WQS) for the State of Washington to protect aquatic life under the Clean Water Act (CWA). Citing Washington's failure to adopt or revise aquatic life WQS for decades, NWEA requested EPA to determine whether new or revised aquatic life WQS were necessary and to issue any WQS it deemed necessary.[1] Four years later, EPA denied the petition. EPA refused to determine whether any new or revised WQS were necessary, citing instead its desire for Washington to take the lead among two other rationales. NWEA now appeals that denial under the Administrative Procedures Act and asks the Court to: (1) find EPA acted arbitrarily and capriciously in denying its petition; (2) vacate the denial of the petition; and (3) remand the petition to EPA "to make a new decision" within 180 days of the Court's Order on Summary Judgment. (See Pl. Mot. at 2 (Dkt. No. 52).)

The Court reviews the statutory framework and the salient factual background below.

**A.      Statutory Background on the CWA**

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through reduction and eventual elimination of the discharge of pollutants into those waters. 33 U.S.C. § 1251(a). To meet these goals, the CWA requires states to develop WQS to protect designated uses of waters within the state's regulatory jurisdiction for human and aquatic life. 33 U.S.C. §§ 1313(a)-(d). A WQS "defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting [numeric or narrative] criteria necessary to protect the uses." 40 C.F.R. § 130.3. Numeric criteria are important elements of WQS because they help set limits on the discharge of toxic pollutants that could interfere with the waters' designated uses. 33 U.S.C. §§

---

[1] NWEA also petitioned EPA to make a necessity determination as to Washington's human health WQS. That part of the petition is not before the Court.

1    1313(c)(2), (d)(4)(C); 40 C.F.R., Part 131, Subpart B. WQS are set for both human and aquatic

2    life. See 33 U.S.C. §§ 1251, 1252, 1317(a)(1).

3         Under Section 303(c) of the CWA, states have the primary responsibility for reviewing,

4    establishing, and revising WQS applicable to their waters. 33 U.S.C. § 1313(c). The CWA

5    requires states to adopt numeric criteria for certain "priority pollutants" where their discharge or

6    presence could reasonably be expected to interfere with the designated uses adopted by a state.

7    33 U.S.C. § 1313(c)(2)(B). EPA identifies "priority pollutants" pursuant to Section 307(a)(1) and

8    issues numeric criteria for them under Section 304(a). See id.; 40 C.F.R. § 131.36(b)(1). When a

9    state reviews, revises, or adopts WQS, it must adopt its own numeric criteria for priority

10   pollutants "the discharge or presence of which in the affected waters could reasonably be

11   expected to interfere with those designated uses." 33 U.S.C. § 1313(c)(2)(B).

12        EPA periodically publishes recommendations reflecting the latest scientific knowledge

13   for states to consult in establishing water quality criteria, including aquatic life criteria for many

14   toxic pollutants. See 33 U.S.C. § 1314(a); (Complaint ¶¶ 42, 44 and Tables B, C, & D (Dkt. No.

15   1)). States must establish WQS based on EPA's recommendations tailored to site-specific

16   conditions or based on scientifically-defensible rationales. 40 C.F.R. § 131.11. And every three

17   years, states must review WQS and modify them as appropriate or adopt new WQS as part of a

18   "triennial review." 33 U.S.C. § 1313(c)(1); 40 C.F.R. § 131.20. Since 2015, states must explain

19   their reasoning for not revising or adopting toxic criteria for which EPA has published new or

20   revised Section 304(a) toxic criteria when the state submits the triennial review results. 40 C.F.R.

21   § 131.20(a).

22        While states play a lead role in setting WQS, EPA serves as a backstop. See Gulf

23   Restoration Network v. McCarthy ("Gulf Restoration II"), 783 F.3d 227, 230-31 (5th Cir. 2015).

24

1   As part of its backstop duties, EPA scrutinizes a state's action or inaction in complying with the

2   CWA. If EPA's Administrator determines that a state's new or revised WQS are inconsistent

3   with the Act or that "a revised or new standard is necessary to meet the requirements of" the Act,

4   the "Administrator shall promptly prepare and publish proposed regulations setting forth a

5   revised or new water quality standard." 33 U.S.C. § 1313(c)(4). EPA's discretionary decision is

6   called a "necessity determination." This discretionary determination is the focus of this lawsuit.

7   And where EPA makes a necessity determination, then it must promulgate a new standard(s)

8   within 90 days unless the state adopts a WQS that EPA finds consistent with the CWA. Id.

9   **B.   NWEA and its Petition**

10          NWEA is a regional non-profit organized in Oregon, some of whose members "reside

11   near, visit, use, and/or enjoy rivers, streams, estuaries, wetlands, marine, and other surface waters

12   throughout Washington, Puget Sound, the Pacific Ocean, and their many tributaries." (Compl. ¶

13   9.) "These NWEA members derive recreational, scientific, personal, professional, and aesthetic

14   benefits from their use and enjoyment of Washington's waters and the fish and aquatic-

15   dependent wildlife that rely upon Washington's waters for habitat-related functions." (Id.)

16   NWEA members intend to continue to use Washington's waters for these various purposes. (Id.

17   ¶¶ 9-10.) NWEA members have also been working to restore salmon habitat to protect both

18   salmon and orca whales. (Id. ¶ 10.) This work is relevant to the present dispute because toxic

19   pollution has long been known to harm both salmon and orca populations in Washington. (Id. ¶¶

20   39-40.) As EPA has noted, Puget Sound's Southern Resident Orcas are some of the most

21   contaminated marine mammals in the world because they feed on contaminated marine life,

22   particularly Chinook salmon, thereby bioaccumulating toxins that enter the water from industrial

23   activities and surface water runoff. (See EPA0007115; EPA0007123-24; EPA0007002-3.)

24

1   Washington, too, "has identified the need to update its aquatic life standards for pollutants most

2   harmful to killer whales and their prey." (Compl. ¶ 40 (citing the Southern Resident Order Task

3   Force Report); see Answer ¶ 40 (Dkt. No. 23).)

4        In October 2013, NWEA petitioned EPA under Section 303(c)(4) of the CWA "to among

5   other things, make a determination that updated aquatic life criteria for toxic pollutants were

6   necessary to protect aquatic life in the State of Washington, and to promulgate federal

7   regulations updating Washington's criteria accordingly." (Compl. ¶ 46; EPA0000001–88.[2])

8   NWEA's desire for EPA to make a necessity determination stems from Washington's listless

9   efforts to adopt and revise aquatic life WQS. (EPA0000001–88; Compl. ¶¶ 41-45; Answer ¶¶ 40-

10  45.) Washington's failure to act is beyond dispute. In 1992 Washington adopted some aquatic

11  life criteria for 25 toxic pollutants, and EPA approved them in 1993. (Compl. ¶ 41; Answer ¶

12  41.) In 1996, 2003, and 2006, Washington adopted new or revised WQS. (Compl. ¶ 42; Answer

13  ¶ 42.) But Washington has not revised or adopted many aquatic life criteria for toxic pollutants

14  for which EPA has recommended Section 304(c) criteria. (Compl. ¶ 44; Answer ¶ 44.) And

15  while Washington's Department of Ecology (Ecology) has discussed updating its criteria, the last

16  time Washington updated any of its aquatic life criteria for toxic pollutants was in 2006. (Compl.

17  ¶ 45; Answer ¶ 45.) Washington lacks aquatic life criteria or has not updated existing criteria for

18  many toxic pollutants for which EPA has recommended 304(a) criteria and many of

19  Washington's existing aquatic life criteria are less stringent than EPA's 304(a) recommended

20  criteria. (Compl. ¶¶ 42, 44, and Tables B, C, and D; Answer ¶¶ 42, 44.) And Ecology last

21  engaged in a triennial review in 2010. (Compl. ¶¶ 52, 63; Answer ¶¶ 52, 63.)

22

23  _____

    [2] NWEA supplemented its petition in 2015 and 2016 and responded to questions from EPA.
24  (EPA0005196–5209; EPA0008591–97.)

1    In February 2017, EPA denied NWEA's petition in its entirety. (EPA0008665–70). This

2    occurred the same day NWEA filed a separate lawsuit to compel EPA to respond to the petition.

3    (Compl. ¶¶ 47-48.) EPA's denial stated that "[w]e do not believe that the use of federal

4    rulemaking authority is the most effective or practical means at this time of addressing the

5    concerns raised in NWEA's petition." (EPA0008665.) EPA so concluded despite admitting that

6    "Ecology has not updated the majority of Washington's life criteria since . . . 1992."

7    (EPA0008667.) EPA presented three reasons for denying the petition, which the Court reviews.

8        First, EPA cited its "[g]eneral policy . . . to work with states on priority-setting in a

9    manner that is consisted with the statutory process envisioned under CWA sections 101(b) and

10   303(c)(3)." (EPA0008668.) EPA believed that cooperative partnership would "efficiently and

11   effectively allocate resources to address pollution and accelerate state adoption of new and

12   revised criteria." (Id.) To this end, EPA cited Ecology's Strategic Plan for 2015-2020 which

13   "includes commitments to update the state's aquatic life criteria." (EPA0008667.) But EPA

14   acknowledged that Ecology had not started rulemaking to adopt new or revised aquatic life

15   criteria. (Id.) EPA noted that it has "encouraged Washington to prioritize revising its aquatic life

16   criteria for ammonia and human health criteria for bacteria." (EPA0008668.) EPA noted further

17   that it had encouraged Washington to issue criteria for copper "given copper's adverse impact on

18   salmonids, which include critically important and endangered species throughout the Pacific

19   Northwest." (Id.) And EPA noted that Ecology's members had attended a workshop in 2015 to

20   discuss copper pollution. (Id.)

21       Second, EPA highlighted the strength of some of Washington's existing criteria as

22   evidence that there was no need to act. EPA noted that Washington's updated human health

23   criteria were "more stringent" than "a substantial fraction of Washington's other existing aquatic

24

1   life criteria," making a revision to "aquatic life criteria for the same pollutants . . . unlikely to

2   result in changes to water quality." (EPA0008668.) EPA also suggested that "some of

3   Washington's existing aquatic life criteria are already more stringent than the corresponding

4   section 304(a) recommended criteria." (Id.) At the same time, EPA admitted that Washington

5   still maintained aquatic life criteria that were less stringent than EPA's Section 304(a)

6   recommendations. (Id.) Rather than make a necessity determination, EPA merely stated that

7   "Washington should prioritize revisions. . . ." (Id.)

8        Third, EPA rejected NWEA's assertion that it was required to revise aquatic life water

9   quality criteria for priority pollutants so that they "match EPA's national scientific

10  recommendations." (EPA0008669.) EPA asserted that NWEA bore the burden to provide

11  evidence that new or revised standards were necessary to meet federal levels to protect

12  Washington's designated uses. (Id.) At the same time, EPA admitted that Washington lacked

13  numeric criteria for one priority pollutant—acrolein. (Id.) But EPA suggested that NWEA failed

14  to "set forth an argument for why the discharge or presence of acrolein could reasonably be

15  expected to interfere with Washington's designated uses." (Id.) EPA also noted that the human

16  health criteria for acrolein was more stringent than the national 304(a) standards for aquatic life

17  criteria. (Id.)

18                                **ANALYSIS**

19  **A.    Legal Standard**

20        The APA "give[s] an interested person the right to petition for the issuance . . . of a rule"

21  from an administrative agency. 5 U.S.C. § 553(e). This applies to the present dispute because the

22  term "rule" includes WQS promulgated by EPA under Section 303 of the CWA. See 33 U.S.C. §

23  1313(c)(4). Whenever an agency denies a petition for rulemaking, it must provide "[p]rompt

24

notice" to the petitioner, ordinarily "accompanied by a brief statement of the grounds for denial."

5 U.S.C. § 555(e). And a petitioner may seek judicial review under Section 706(2)(A) of the

APA, and ask a court to set aside an agency action that is "arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). As the Court has already

held, EPA's denial of NWEA's petition is subject to judicial review under the APA. (See Order

on Motion to Dismiss at 7-11 (Dkt. No. 22) (citing Massachusetts v. EPA, 549 U.S. 497, 527-28

(2007)).)

At summary judgment on an APA claim, the Court "limits its review to the

administrative record" to determine whether the movant is entitled to judgment as a matter of

law. San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 992 (9th Cir. 2014); Fed.

R. Civ. P. 56(a). Where, as here, an agency has refused to engage in rulemaking, the Court's

"review is 'extremely limited' and 'highly deferential.'" Massachusetts, 549 U.S. at 527-28

(quoting Nat'l Customs Brokers & Forwarders Assn. of Am., Inc. v. United States, 883 F.2d 93,

96 (C.A.D.C. 1989)). The Court must assess whether the agency "considered the potential

problem identified in the petition and provide[d] a 'reasonable explanation as to why it cannot or

will not exercise its discretion' to initiate rulemaking." Compassion Over Killing v. U.S. Food &

Drug Admin., 849 F.3d 849, 857 (9th Cir. 2017) (quoting Massachusetts, 549 U.S. at 533).

Stated differently, to withstand judicial scrutiny, EPA must have "provided a 'reasonable

explanation,' which must be grounded in the statute, as to why it declined to make a necessity

determination." Gulf Restoration Network v. Jackson ("Gulf Restoration III"), 224 F. Supp. 3d

470, 474 (E.D. La. 2016) (quoting Gulf Restoration II, 783 F.3d at 244).

**B.    Subject Matter Jurisdiction**

Though EPA does not challenge NWEA's standing, the Court considers NWEA's standing <u>sua sponte</u> to ensure it has subject matter jurisdiction over this dispute.

To establish standing, a plaintiff must show it has suffered an injury in fact that is fairly traceable to the challenged action and likely to be redressed by a favorable decision. <u>Friends of the Earth, Inc. v. Laidlaw Env'tl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180–81 (2000). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

NWEA has standing. First, three members of NWEA demonstrate that they would have standing to pursue the claims NWEA asserts against EPA. These members all reside in Washington and aver that their use and enjoyment of Washington's waters and the aquatic life found therein have been greatly diminished by pollution that enters into Washington's waters. (<u>See</u> Declaration of Harry Branch ¶¶ 7-13; Declaration of R. Jerome White, Jr. ¶¶ 7-13, 15, 17-18; Declaration of Greg Wingard ¶¶ 12-20.) Two of the members also assert that Washington's failure to adopt new and revised aquatic life WQS adversely impacts the work they do to protect aquatic life and restore habitat. (<u>See</u> White Decl. ¶ 4-6, 18; Wingard Decl. ¶¶ 5, 7, 10, 21-23.) These individuals allege an injury in fact that is fairly traceable to EPA's failure to make a necessity determination as to whether to adopt new and revised aquatic life WQS in Washington, and which could be redressed by vacating EPA's denial of NWEA's petition and remanding for further agency action. Second, these individuals share NWEA's interest in protecting the right to

1    clean water and aquatic life, as well as NWEA's recreational, aesthetic, conservation,

2    employment, scientific, educational, and spiritual interests in clean water in Washington. (See

3    Declaration of Nina Bell ¶¶ 18-19; White Decl.; Wingard Decl.; Branch Decl.) Third, NWEA's

4    claim and the relief it requests do not require the participation of its members. Accordingly,

5    NWEA has standing, and the Court has subject matter jurisdiction.

6    **C.      EPA Has Not Yet Made a Necessity Determination**

7           Before reaching the core legal dispute, the Court considers NWEA's novel argument

8    raised in its opposition/reply that EPA made a de facto negative necessity determination when it

9    denied its petition. This argument lacks merit for two key reasons.

10          First, NWEA's argument contradicts its own complaint which alleges only that EPA has

11   failed to make a necessity determination: "EPA did not make a determination as to whether new

12   or revised aquatic life criteria are necessary to meet the requirements of the Clean Water Act."

13   (Compl. ¶ 74(A); see also id. ¶ 50 (asserting that EPA "side-stepped the Petition's request that it

14   decide whether new or revised aquatic life criteria were necessary to meet the requirements of

15   the" CWA").) Based on the existing complaint, NWEA cannot reasonably maintain its argument

16   that EPA has already made a necessity determination.

17          Second, NWEA's argument conflicts with the relief that it requests. The complaint asks

18   for an order setting aside EPA's denial and compelling EPA "to render a new decision on the

19   portion of NWEA's Petition requesting that EPA update the State of Washington's aquatic life

20   criteria for toxic pollutants by a date certain." (Compl. Prayer for Relief ¶ 2-3.) In other words,

21   NWEA wants EPA to make a necessity determination, not necessarily a positive or negative one.

22   By arguing that EPA already made a negative necessity determination, NWEA is effectively

23   asking the Court to order EPA to make a positive necessity determination. But that is not the

24

1    relief requested in the complaint or in NWEA's Motion. Finding that EPA has already made a

2    negative necessity determination and ordering it to make a positive one would impermissibly

3    expand the nature of the action and relief requested.

4        The Court therefore rejects NWEA's argument and limits its review to the question of

5    whether EPA acted arbitrarily and capriciously in refusing to make a necessity determination—

6    not that it made a negative necessity determination.

7    **D.    EPA's Refusal to Make a Necessity Determination is Arbitrary and Capricious**

8        To resolve the Cross Motions for Summary Judgment, the Court must determine whether

9    EPA's refusal to make a necessity determination on Washington's aquatic life standards was

10    reasonable and grounded in the CWA. Using an extremely limited and highly deferential review,

11    the Court finds that all three of EPA's bases for its denial of NWEA's petition are arbitrary and

12    capricious and ungrounded in the CWA. See Massachusetts, 549 U.S. at 527-28.

13        **1.    Cooperative federalism does not support EPA's denial**

14        Citing the CWA's state-led cooperative federalism framework, EPA argues it was

15    reasonable not to make a necessity determination because the most "effective and efficient" path

16    forward was to wait for Washington to act. This argument cannot be squared with either the

17    CWA or the record showcasing Washington's failure to update the majority of its aquatic WQS

18    since 1992. (See EPA0008667.)

19        The CWA operates on a principle of cooperative federalism where states take the lead in

20    setting WQS with the goal of eliminating pollutant discharge into navigable waters to protect and

21    enhance human and aquatic life. 33 U.S.C. §§ 1251(a)-(b), 1313(a). States must create WQS

22    specific to aquatic life and review them every three years to determine whether new or revised

23    standards are necessary. See 33 U.S.C. § 1313(a), (c)(1), (c)(2)(A); see City of Arcadia v. U.S.

24

1  Env't Prot. Agency, 411 F.3d 1103, 1106 (9th Cir. 2005). But while states play a lead role in

2  setting WQS, EPA serves as a backstop. See Gulf Restoration II, 783 F.3d at 230-31; (Def. Mot.

3  at 22 (admitting that EPA plays a backstop role under Section 303(c)(4)(B)). Not only does EPA

4  have to review state-adopted WQS, but it must also "promptly prepare and publish" new WQS

5  for a state "in any case where the Administrator determines that a revised or new standard is

6  necessary to meet the requirements of this chapter." 33 U.S.C. § 1313(c)(4)(B). While this

7  "necessity determination" is discretionary, it exists to ensure EPA has a mechanism to meet the

8  CWA's goals to protect and enhance water quality where a state fails to uphold its part of the

9  bargain.

10      EPA's decision not to make a necessity determination about Washington's out-of-date

11  WQS for aquatic life cannot be justified by the CWA's state-first framework of cooperative

12  federalism. This framework presumes a state will take the lead on and be a collaborative partner

13  in creating and revising WQS. But here Washington had abdicated its duties under the CWA,

14  having failed to update the majority of its aquatic life WQS since 1992, as EPA concedes.

15  (EPA0008667.) And at the time EPA denied the petition in 2017, Washington had not engaged

16  in the triennial review process since 2010. EPA tries to minimize these facts by citing to

17  Ecology's Strategic Plan for 2015-2020 which "includes commitments to update the state's

18  aquatic life criteria." (EPA0008667.) But EPA concedes in its briefing this was only a sign of

19  "anticipate[d] progress" not actual progress or leadership. (Def. Mot. at 22.) So while EPA

20  wanted to "work in partnership to efficiently and effectively allocate resources to address

21  pollution and accelerate state adoption of new and revised criteria," nothing in the record showed

22  that Washington was a willing partner. (EPA0008668.) And certainly nothing in the record

23  supports EPA's belief that inaction would be an efficient or effective way of ensuring adequate

24

1    WQS or complying with the goals and requirements of the CWA. Even applying the high degree

2    of deference, the Court finds that EPA's rationale is ungrounded in the CWA and unreasonable.

3    EPA's citation to Washington's potential efforts to review and revise aquatic WQS do

4    not justify its decision to defer to Washington. First, EPA notes it encouraged "Washington to

5    prioritize revising its aquatic life criteria for ammonia and human health criteria for bacteria."

6    (EPA0008668.) But EPA admits its "understanding is that Washington intends to turn its focus

7    to revising its bacteria criteria" not the aquatic life WQS for ammonia. (Id.) This is not evidence

8    that EPA's inaction would lead to an "efficient or effective" response. Second, EPA notes that it

9    encouraged Ecology to adopt EPA's "section 304(a) criteria for copper, the copper Biotic Ligand

10   Model (BLM)" and that Ecology attended an EPA-led workshop in 2015 on the copper BLM.

11   (Id.) But EPA also cites to evidence that Washington had not adopted WQS regarding copper

12   and admitted that "other pollutants may emerge as higher priorities [for Washington]." (Id.) This

13   wait-and-see approach appears particularly ill-conceived in light of EPA's recognition that

14   copper pollution has an "adverse impact on salmonids," whose health impacts "critically

15   important and endangered species throughout the Pacific Northwest." (Id.) EPA's citation to its

16   minimal efforts to prod Washington to revise WQS for two pollutants fails to demonstrate a

17   reasonable basis to refuse to make a necessity determination as to all of the pollutants for which

18   the existing criteria were out of date or absent.

19   The Court also notes that the record before it stands in sharp contrast to the two cases on

20   which EPA largely relies. See WildEarth Guardians v. U.S. E.P.A., 751 F.3d 649 (D.C. Cir.

21   2014); Gulf Restoration III, 224 F. Supp. 3d 470. In both of these cases EPA's denial of a

22   petition to undertake a discretionary determination was upheld in large part because EPA had

23   undertaken substantial efforts to work with the states at issue to produce regulations protective of

24

the harms identified in the administrative petitions. The same cannot be said here, where EPA cites to a single workshop on copper and generalized encouragement.

The CWA's cooperative federalism framework provides no justification for EPA's refusal to make a necessity determination when all the evidence before EPA showed that Washington had essentially abandoned its duties under the CWA. EPA's Waiting-for-Godot approach to the necessity determination process cannot be justified with the framework or purpose of the CWA. Even considering the highly deferential standard of review, the Court finds EPA's decision and justification to be arbitrary and capricious.

**2.      EPA's finite resources do not justify inaction**

EPA also asserts that its limited resources justify inaction on NWEA's petition. Even under the applicable deferential standard, the Court finds this rationale insufficient to support denial of NWEA's petition.

In its denial, EPA noted that it was "exercising its discretion to allocate its resources in a manner that supports regional and state activities to accomplish our mutual goals of protecting human health and the environment." (EPA0008670.) While it is indisputable that EPA has limited resources, the record does not show EPA was dedicating any meaningful resources to helping Washington review or revise aquatic WQS. At most, EPA held a workshop in 2015 about copper and then gave Washington "encouragement" to consider new ammonia WQS for aquatic life. There is no evidence as to what burden these limited efforts imposed on EPA beyond its congressionally-mandated duties, making EPA's claim that it was "devot[ing] resources . . . to . . . continued collaboration with the State" ring hollow. (Def. Mot. at 21.) EPA has also not identified any way in which the necessity determination process would divert its resources in a counterproductive manner. Nor has EPA provided any evidence of how time- or

1    resource-intensive it would be to make the necessity determination that NWEA demands. The

2    closest EPA comes is a footnote in which it cites to the "several years" it took to "make a

3    necessity determination concerning Washington's human health criteria and subsequently

4    promulgated 144 human health criteria." (Reply at 9 n.6.) But this is not specific to aquatic life

5    WQS and it is overinclusive—it lumps together the time for both the necessity determination and

6    the promulgation of new criteria. And, as EPA admits, "the process for deriving aquatic life

7    criteria is not the same as the process for human health criteria." (Def. Mot. at 18.) The record

8    contains no evidence to support EPA's claim that its finite resources justify its decision not to

9    undertake the necessity determination process.

10       The two cases EPA cites to as justification lack any factual similarity and highlight the

11   arbitrary nature of EPA's denial. (See Def. Mot. at 22 (citing WildEarth, 751 F.3d at 655-56;

12   Gulf Restoration III, 224 F. Supp. 3d at 477).)

13       First, in WildEarth, EPA refused to consider adding coal mines to its list of regulated

14   sources under that Clean Air Act, choosing instead to dedicate its finite resources to regulating

15   more significant sources of air pollution. See WildEarth, 751 F.3d at 655-56. The court in

16   WildEarth found that the decision to focus on "more significant sources of air pollutants before

17   addressing coal mines is consistent with the statutory objective of reducing hazardous emissions

18   overall." WildEarth, 751 F.3d at 655. The court so concluded in part because EPA produced

19   evidence of specific steps it was taking to reduce air pollution and a reasoned basis to support its

20   conclusion that "[d]iverting resources from regulating the most significant sources of air

21   pollution to regulate less-significant sources might increase overall emissions." Id. The court also

22   noted that EPA's resources were already reduced by budgetary and personnel constraints and

23   other 45 mandatory rulemakings. Id. NWEA has provided the Court a copy of EPA's denial

24

1    letter in <u>WildEarth</u>, which stands in stark contrast to its denial of NWEA's petition. (<u>See</u> Ex. A to

2    Pl. Reply.) EPA's denial letter in <u>WildEarth</u> contains a reasoned explanation of how EPA was

3    using its limited resources to address the issue of air pollution and why the sought-after

4    regulation of coal mines could not reasonably be accomplished without diverting its limited

5    resources in a counterproductive way. Here, EPA's denial letter contains no explanation of how

6    it was marshalling its limited resources to protect Washington's waters or why simply waiting

7    for Washington to act would be reasonable to meet the CWA's goals. This undermines EPA's

8    position.

9            Second, EPA's justifications for refusing to make a necessity determination in <u>Gulf</u>

10   <u>Restoration III</u> contrast sharply with its rationale advanced in the present dispute. In <u>Gulf</u>

11   <u>Restoration III</u>, the plaintiffs wanted EPA "to impose federal numeric water quality standards for

12   the portion of the ocean protected by the CWA but outside the jurisdiction of any state and for all

13   water bodies in all states for which numeric water quality standards controlling nitrogen and

14   phosphorous pollution have not yet been established." <u>Gulf Restoration III</u>, 224 F. Supp. 3d at

15   472. The Court found EPA's denial was grounded in the CWA because the sought-after

16   rulemaking was "unprecedented and complex," "highly resource and time intensive," required

17   staff from across the whole agency and outside experts, and imposed substantial ongoing

18   oversight burdens. <u>Id.</u> at 475. And EPA demonstrated that it was otherwise actively working in

19   partnership with the states "through non-rulemaking programs that it was implementing to

20   address the problem with the states." <u>Id.</u> NWEA has also provided the denial letter from that

21   case, which shows EPA documented how it was deploying significant resources to create a

22   collaborative framework to work with the affected states to address issues, provide specific

23   technical assistance, and improve tracking and accountability. (<u>See</u> Ex. C to Pl. Reply.) The

24

1    decision not to make a necessity determination was thus grounded in the statute with a robust

2    explanation of what steps EPA was taking to address the issue the petitioner raised and why that

3    was a better use of EPA's limited resources. The same cannot be said here. EPA cites to no

4    ongoing efforts to help Washington address aquatic WQS other than a solitary workshop on

5    copper and unspecific "encouragement." The rationale EPA advances here cannot be squared

6    with the CWA or the record and decision in Gulf Restoration III.

7         Even under the highly deferential standard of review, EPA's reliance on its finite

8    resources does not serve as a reasonable basis grounded in the CWA to deny NWEA's petition.

9         **3.    Washington's human health WQS criteria do not support denial**

10        The Court finds EPA's final rationale—Washington's existing WQS and other criteria—

11   ungrounded in the CWA and illogical.

12        EPA justified its denial of the petition by citing to existing WQS and criteria as

13   sufficiently robust to comply with the CWA. First, EPA suggests that because some of

14   Washington's updated human health criteria were "more stringent" than "a substantial fraction of

15   Washington's other existing aquatic life criteria," revision to "aquatic life criteria for the same

16   pollutants . . . [was] unlikely to result in changes to water quality." (EPA0008668.) Second, EPA

17   suggests that "some of Washington's existing aquatic life criteria are already more stringent than

18   the corresponding section 304(a) recommended criteria." (Id.)

19        Neither rationale supports EPA's refusal to make a necessity determination.

20        First, EPA provided no evidence it undertook any investigation into whether the updated

21   human health criteria would protect aquatic life. It merely supposed that the more restrictive

22   human health criteria would be protective. That is not a reasoned justification. EPA essentially

23   admits as much, stating that "the process for deriving aquatic life criteria is not the same as the

24

1    process for human health criteria." (Def. Mot. at 18.) EPA's rationale also fails to track the

2    CWA, which treats human health and aquatic life differently and requires different

3    considerations and standards. That makes logical sense, for what might be harmless to humans

4    could well be fatal to aquatic life. And EPA concedes this point: "in certain instances an aquatic

5    life criterion may need to be more stringent than a human health criterion for the same pollutant

6    in order to protect aquatic species." (Answer ¶ 55.) For example, EPA has recommended that

7    aquatic life criteria for copper not exceed 4.8 micrograms per liter to avoid acute effects or 3.1

8    micrograms per liter to avoid chronic effects, while recommending the human health criteria for

9    copper not to exceed 1,300 micrograms per liter. (Compare EPA0004384 (2013 304(a) copper

10   aquatic life criteria) with EPA0004387 (2013 304(a) copper human health criteria).) EPA's

11   reliance on Washington's human health criteria remains unreasoned and at odds with the CWA.

12         Second, whether some of Washington's existing aquatic life criteria are more stringent

13   than EPA's Section 304(a) recommendations does not necessarily mean that the state criteria are

14   adequate. Again, EPA can cite to no specific analysis it undertook to show that the federal

15   criteria are adequate to protect the unique aquatic life in Washington. Simply assuming that

16   EPA's recommendations would be protective is not the product of a reasoned decision-making

17   process. Nor does it pay any heed to the unique species in Washington, such as Puget Sound's

18   Southern Resident Orcas who are some of the most contaminated marine mammals in the world

19   due to bioaccumulation through the food stock, particularly through Chinook salmon. (See

20   EPA0007115; EPA0007123-24; EPA0007002-3); 40 C.F.R. § 131.11 (requiring criteria to be

21   protect site-specific designated uses). Without undertaking a specific analysis of the criteria in

22   the context of Washington's waters and aquatic life, EPA's broad statements are conjectural and

23   not grounded in the statute.

24

1   administrative proceedings were unnecessary where "the record has been fully developed, and

2   the conclusions that must follow from it are clear." Id. The court also noted that "exceptional"

3   circumstances have included remanding with instructions to recalculate Medicare service

4   provider reimbursements using newly-available data, remanding with instructions to award

5   Social Security benefits on a fully developed record, and remanding with instructions where EPA

6   had exceeded its statutory authority by granting a nonattainment exception on statutorily-

7   unenumerated grounds. Id. (collecting cases).

8          This case presents exceptional circumstances justifying the imposition of a timeline on

9   EPA's further review. First, the record before the Court reflects substantial and unjustified delay

10  on the part of EPA. The majority of Washington's WQS for aquatic life were last updated in

11  1992 and Washington has not undertaken a triennial review since 2010 despite the CWA's

12  requirements it do so. While Washington recently started this process, there are no assurances of

13  a timely set of new or revised aquatic life WQS. Despite acknowledging Washington's feeble

14  efforts to timely comply with the CWA, EPA has not taken its backstop role seriously and has

15  unreasonably abandoned its role for years. (See EPA0008668.) And given the threats to various

16  species that EPA has itself acknowledged, continued delay cannot be squared with the CWA's

17  purpose of protecting aquatic life. (See id.) EPA's argument against NWEA's request is simply

18  to point out that NWEA waited three years from the denial to file this action. That fact certainly

19  cuts against NWEA's argument that time is of the essence. But that alone does not undermine the

20  fact that Washington's aquatic life WQS remain outdated, that future standards appear years

21  away, and that EPA has not timely acted as a backstop. NWEA's delay in filing this action does

22  not convince the Court that a timeline for remand is improper.

23

24

1    Second, the Court has not been presented with any evidence that the necessity

2    determination requires agency review that cannot be completed in 180 days. The Court

3    acknowledges EPA's position that the analysis is burdensome and resource intensive. (See Def.

4    Reply at 12.) But EPA does not contend that it cannot complete the necessity determination in

5    180 days or that it needs to engage in substantial fact finding or review that might exceed that

6    time frame. Nor does it contend that the necessity determination requires any expertise beyond

7    what the Agency already possesses as part of mandate to implement and enforce the CWA.

8    There is no reasoned basis to allow further delay to stand in the way of EPA making a necessity

9    determination.

10    Having considered the issue, the Court finds that the record before it presents an

11    "exceptional case" meriting the imposition of a timeline on EPA's further action. The Court

12    agrees with NWEA that EPA must make its necessity determination within 180 days from entry

13    of this Order. But to allay EPA's fears (which are at present unsupported), the Court will allow

14    EPA to petition the Court for additional time should EPA identify any specific reasons why it

15    cannot make that deadline. Any such request must contain specific, detailed explanations of why

16    additional time is necessary and what tasks remain to be performed. Evidentiary support must be

17    provided. On this basis, the Court GRANTS in part NWEA's Motion on this issue and

18    REMANDS this matter to EPA to make a necessity determination within 180 days of entry of

19    this Order.

20                                    **CONCLUSION**

21    The CWA relies on states to take the lead in implementing aquatic life WQS. But this

22    does not mean EPA serves as a mere bystander. It must play a backstop role and step in when

23    states refuse or are unable to act in compliance with the CWA. Here, NWEA has identified

24

EPA's failure to meet its statutory obligation to play its backstop role and make a necessity determination as to Washington's outdated aquatic life WQS. Even under the highly deferential standard of review, EPA's denial of NWEA's petition to make a necessity determination lacks any defensible rationale, and the Court finds that it is arbitrary, capricious, and incompatible with the CWA. As such, the Court VACATES EPA's denial and REMANDS the petition to EPA to make a necessity determination. Given the exceptional circumstances presented in this case, the Court ORDERS EPA to issue its necessity determination within 180 days of entry of this Order unless it obtains leave of Court for additional time consistent with this Order. On this basis, the Court GRANTS in part NWEA's Motion and DENIES EPA's Motion.

The clerk is ordered to provide copies of this order to all counsel.

Dated December 29, 2021.

Marsha J. Pechman
United States Senior District Judge